**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SANDRA L. CURRAN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-142 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant | ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

## I.  INTRODUCTION

Sandra L. Curran ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381 - 1383f ("Act").  This matter comes before the court on cross motions for summary judgment. (ECF Nos. 10, 12).  For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II. Procedural History

Plaintiff filed for DIB and SSI with the Social Security Administration June 23, 2006, claiming an inability to work due to disability beginning April 30, 2005. (R. at 85 – 90)[1]. Plaintiff was initially denied benefits on December 6, 2006. (R. at 62 – 69). A hearing was scheduled for June 17, 2008, and Plaintiff appeared to testify represented by counsel. (R. at 20). A vocational expert also testified. (R. at 20). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on October 6, 2008. (R. at 11 – 19). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on April 8, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 2 – 5).

Plaintiff filed her Complaint in this court on June 4, 2010. (ECF No. 1). Defendant filed his Answer on August 25, 2010. (ECF No. 3). Cross motions for summary judgment followed.

## III. Legal Standard

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[2] and 1383(c)(3)[3]. Section 405(g) permits a district court to review

---

[1]  Citations to ECF Nos. 4 – 4-3, and 9 – 9-1, the Record, *hereinafter*, "R. at __."

[2]  Section 405(g) provides in pertinent part:
>      Any individual, after any final decision of the [Commissioner] made after a hearing to which he
>      was a party, irrespective of the amount in controversy, may obtain a review of such decision by a
>      civil action ... brought in the district court of the United States for the judicial district in which the
>      plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3]  Section 1383(c)(3) provides in pertinent part:
>      The final determination of the Commissioner of Social Security after a hearing under paragraph
>      (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent
>      as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. § 706. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ. The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of at least 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## IV. EVIDENTIARY RECORD

The facts relevant to the present case are limited to those records that were available to the ALJ when rendering his decision. All other records newly submitted[4] to the Appeals Council or this Court will not be considered, here. *See* DISCUSSION, *infra* at 28.

---

[4] R. at 524 - 628.

A. General Background

Plaintiff was born on November 12, 1960, and was forty seven years of age at the time of her administrative hearing. (R. at 85). Plaintiff was twice married, and had two children and a number of grandchildren. (R. at 255). Plaintiff was dating a man from whom she rented her apartment. (R. at 33, 255). He lived in the first floor apartment; she lived in the second floor apartment. (R. at 33). Plaintiff dropped out of high school when she was eighteen years of age, but received her GED in 1990. (R. at 254, 460). Plaintiff attended Clarion University for business administration, but did not complete her degree. (R. at 471). At the time of the hearing, Plaintiff was not employed and subsisted on welfare benefits. (R. at 24). She received medical insurance through the government, as well. (R. at 24). Plaintiff lost her medical coverage on a number of occasions between 2005 and 2008, however. (R. at 25 - 26).

B. Plaintiff's Functional Report

On July 2, 2006, Plaintiff completed a questionnaire regarding her daily activities and functional capabilities. (R. at 120 – 32). Plaintiff complained that she was limited by left leg pain and swelling, difficulty concentrating, anxiety, post-traumatic stress disorder ("PTSD"), bipolar disorder, and confusion. (R. at 120 – 32). Her conditions were exacerbated by over-activity. (R. at 120 – 32). She claimed that one of her friends would come over to her home twice a week to help with cleaning and her daughter would help with caring for her dogs. (R. at 120 – 32). At the time, Plaintiff was engaging in a partial-hospitalization program, receiving counseling three times per week. (R. at 120 – 32). She also would visit her doctor approximately once per week and attended physical therapy for her left leg twice per week. (R. at 120 – 32).

Plaintiff explained that her physical and mental conditions had rendered her unable to work; she no longer walked her dog, had difficulty completing tasks, and she only bathed every other day, because it was easier. (R. at 120 – 32). Plaintiff did not need reminders to take care of her personal hygiene, however. (R. at 120 – 32). She sometimes suffered panic attacks. (R. at 120 – 32). Weight gain became a problem. (R. at 120 – 32). Reading comprehension was a weakness and often required Plaintiff to read instructions multiple times. (R. at 120 – 32).

However, she did manage to cook a meal once a day and prepare herself a lunch once a day. (R. at 120 – 32). She typically took out the trash every day, ran the vacuum cleaner twice per week, did laundry once a week, cleaned dishes twice per day, dusted once a week, and cleaned her floors every other week. (R. at 120 – 32). Plaintiff was capable of driving herself to appointments, and to go grocery shopping. (R. at 120 – 32). She could only carry four bags of groceries at a time, and therefore had to make multiple trips up and down the steps to her residence. (R. at 120 – 32). Plaintiff would frequently need to rest between activities, often for up to an hour. (R. at 120 – 32). Plaintiff's hobbies included watching television, collecting movies, and fishing, when she felt able. (R. at 120 – 32).

Plaintiff averred that she could climb six to seven steps in a row before feeling pain and requiring rest. (R. at 120 – 32). She could only walk fifty feet before feeling pain and requiring rest. (R. at 120 – 32). She did not require any assistive devices to walk. (R. at 120 – 32). Plaintiff could sit for two to three hours in a row, but would need to move occasionally because of stiffness. (R. at 120 – 32). Plaintiff's knee pain often required her to elevate her leg and place ice on it for approximately two hours. (R. at 120 – 32). The pain could be worsened with movement and occurred regularly, even lasting all day. (R. at 120 – 32).

Plaintiff explained that she was physically abused by her father when she was a child, and suffered lasting psychological trauma. (R. at 120 – 32). She did not participate in any activities with her extended family. (R. at 120 – 32). Plaintiff did not feel like herself when she was in public. (R. at 120 – 32). She had experienced conflicts with co-workers in the past. (R. at 120 – 32).

C. <u>Physical Treatment History</u>

Plaintiff was diagnosed with symptomatic cholelithiasis[5] by Frank Klinger, M.D. in early September of 2005 following complaints by Plaintiff of discomfort in her right flank. (R. at 375 – 77). The pain was often stabbing in nature and was accompanied by nausea. (R. at 375 – 77). Plaintiff had not lost weight, but did suffer from intermittent loose stools and constipation. (R. at 375 – 77). Consecutive magnetic resonance images ("MRI") showed evidence of cholelithiasis. (R. at 375 – 77). Plaintiff elected to undergo cholecystectomy to treat the condition. (R. at 375 – 77). Plaintiff was smoking cigarettes and consuming approximately ten beers per week at the time of her diagnosis. (R. at 375 – 77). She was noted to be obese, but not otherwise in distress. (R. at 375 – 77). Subsequent imaging of Plaintiff's upper gastrointestinal tract, also in early September of 2005, revealed the presence of gastroesophageal reflux ("GERD"). (R. at 390). On September 13, 2005, Dr. Klinger performed a laparoscopic cholecystectomy and a cholangiogram on Plaintiff – successfully removing her gallbladder. (R. at 378 – 79).

Plaintiff presented to William Hebda, M.D. in late February of 2006, complaining of chest pain. (R. at 150). She also stated that she had not felt well since her cholecystectomy, continued to suffer from diarrhea and abdominal pain, and experienced unusual pain and pressure in her chest. (R. at 150). However, imaging of Plaintiff's chest returned normal results.

---

[5]  Cholelithiasis is the presence or formation of gallstones in the gallbladder or common bile duct. ELSEVIER , DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 353 (30th ed. 2003).

(R. at 151, 189). An electrocardiogram ("EKG") of Plaintiff's chest also showed no significantly abnormal results. (R. at 151). Plaintiff was diagnosed with chest pain but with no evidence of myocardial infarction. (R. at 151). Stress testing also produced no significantly abnormal results. (R. at 144, 156, 190, 207). It was determined that Plaintiff's pain was likely the result of GERD, given her obesity. (R. at 144).

Plaintiff still complained of chest pain in March of 2006. (R. at 207 – 11). Yet, she was found to be in no acute distress, had normal chest x-rays, and had normal EKG results. (R. at 207 – 11, 239). Cardiac catheterization was recommended, however, in order to determine the exact etiology of Plaintiff's pain. (R. at 207 – 11). Plaintiff was continuing to smoke two packs of cigarettes a day, and drank several beers per week; she was advised to avoid such behavior. (R. at 207 – 11). Her subsequent heart catheterization returned normal results. (R. at 456).

Due to Plaintiff's persistent complaints of abdominal pain and diarrhea, computed tomography ("CT") scans of Plaintiff's upper abdomen and pelvis were conducted in August of 2006. (R. at 340). A renal cyst was observed on the left kidney, diverticulosis was noted in the colon, and a cyst was found on Plaintiff's right ovary. (R. at 340). Another CT of the pelvis in October of 2006 revealed similar results, although the ovarian cyst had resolved on its own. (R. at 317). Further, while diverticulosis was observed, there was no evidence of diverticulitis. (R. at 317). Plaintiff continued to complain of abdominal pain and nausea into October of 2006, however. (R. at 303). Plaintiff underwent a colonoscopy around June of 2008. (R. at 503). Benign polyps were found, and there was no evidence of microscopic colitis. (R. at 503). She was recommended for a follow up colonoscopy in ten years. (R. at 503).

Due to complaints of left knee pain and swelling, Plaintiff was referred by her primary care physician, Norman Beals, M.D. to W.D. Fritz, M.D. for an orthopedic consultation. (R. at

261 – 64, 272).  On June 9, 2006, Plaintiff was seen by Dr. Fritz, who noted that an MRI and x-ray of the knee revealed degenerative changes in the patellofemoral compartment, and small joint effusion with suspected small loose bodies in the knee joint.  (R. at 272).  There was no joint effusion, no ligament laxity, and good range of motion with only mild crepitus.  (R. at 272). These findings were consistent with earlier examinations of her joints and knee that revealed no gross joint deformity, effusion, or pedal edema.  (R. at 152, 210).  She showed no difficulty moving all of her extremities.  (R. at 151, 210).

Plaintiff was considered an eventual candidate for arthroscopic knee surgery to remove the loose bodies.  (R. at 272).  Plaintiff was recommended for physical therapy to treat her discomfort in the meantime.  (R. at 272).  At a follow up with Dr. Fritz in late June, following a period of physical therapy, Plaintiff still complained of pain, but explained that the therapy was helping.  (R. at 272).  She was generally feeling better, and was capable of walking up stairs normally.  (R. at 272).  Plaintiff was advised to continue with physical therapy and was given a cortisone injection for additional pain relief.  (R. at 272).  The physical condition of her left knee was unchanged.  (R. at 272).

Physical therapy notes spanning June and July of 2006 indicated Plaintiff experienced substantial improvement in her knee pain.  (R. at 282 – 94, 302).  Plaintiff initially noted that her pain ranged from four to ten on a pain scale of ten.  (R. at 282 – 94, 302).  Her pain was worst in the evenings after being on her feet all day.  (R. at 282 – 94, 302).  Walking did not cause her as much pain as standing.  (R. at 282 – 94, 302).  She did not require an assistive device to walk. (R. at 282 – 94, 302).  Over time, however, Plaintiff's pain decreased and her range of motion increased.  (R. at 282 – 94, 302).  Plaintiff's left knee strength also improved.  (R. at 282 – 94, 302).  After approximately one month of treatment her pain was reduced to one on a pain scale

of ten. (R. at 282 – 94, 302). By the end of her therapy in late July, Plaintiff's left knee and hip strength were improved, her pain was continuing to decrease, and her range of motion was increased. (R. at 282 – 94, 302). Plaintiff reported feeling better. (R. at 282 – 94, 302). On February 13, 2008, Plaintiff underwent a partial medial meniscectomy of her left knee. (R. at 517). Plaintiff's knee debris was suctioned out. (R. at 517).

Plaintiff also complained of frequent migraine headaches. (R. at 305). As a result, an MRI of Plaintiff's brain was performed on September 19, 2006. (R. at 331). Mild mucosal thickening was noted in several anterior ethmoid air cells, and some scattered small foci of white matter signal hypersensitivity were found, but there was no suggestion of demyelinating disease or other brain abnormalities. (R. at 331). At the behest of James R. McLaughlin, D.O. – Plaintiff's treating source for her migraines – Plaintiff kept a diary regarding the times and triggers of her headaches. (R. at 435, 501).

At a visit with Dr. McLaughlin in December of 2007, Plaintiff explained that she had suffered from near-constant headaches since she was five or six years of age. (R. at 433). The headaches could last anywhere from several hours to several days. (R. at 433). Recently prescribed Depakote had reduced her headache pain from nine or ten on a pain scale of ten, to five or six. (R. at 433). Even on the medication, however, she continued to experience two to three bad headaches every other month or so. (R. at 433). Although, Plaintiff had claimed in earlier treatment with other doctors that if she caught a headache early enough, ibuprofen was sufficient to treat it. (R. at 152). Dr. McLaughlin noted a history of neck pain, and a history of temporal mandibular joint dysfunction. (R. at 433). Plaintiff denied tingling, numbness, weakness, or difficulties with vision as a result of her headaches. (R. at 433). Scans of her brain were largely unremarkable. (R. at 433).

Dr. McLaughlin noted that Plaintiff's mental state was largely normal – she was awake, alert, cooperative, fully oriented, capable of following simple verbal and written commands, and could repeat names and visualize normally. (R. at 434). Neurologically, Plaintiff was also largely unremarkable. (R. at 435). A motor examination revealed normal tone, bulk, and strength in Plaintiff's upper and lower extremities. (R. at 435). She was capable of rising from a sitting to a standing position independently. (R. at 435). Movement associated with ambulation also was normal. (R. at 435). Plaintiff was diagnosed with migraine, cervicalgia, muscle tension headache, and TM joint probable bruxism. (R. at 435). Plaintiff was continued on prescription medication, and was advised to follow up with a dentist to look into getting a bite plate to potentially alleviate headache pain. (R. at 436).

Plaintiff attended a follow up session with Dr. McLaughlin in April of 2008. (R. at 431). She still complained of severe headaches up to twice per week. (R. at 431). While tracking her headaches with her diary, she discovered that specific triggers, such as stress and decreased sleep, produced headaches. (R. at 431). She also found that prescription Axert provided by Dr. McLaughlin dramatically relieved her headache pain. (R. at 431). Upon examination, Plaintiff's mental, neurological, and motor examinations were the same as before. (R. at 431 – 32). Plaintiff was to continue on Axert, and her dosage of Depakote was increased. (R. at 431 – 32). Plaintiff was diagnosed with mixed headache disorder, including migraine, cervicalgia, muscle tension headache, and TM joint probable bruxism. (R. at 432).

D. Psychiatric Treatment History

Plaintiff's psychiatric treatment history begins with an appearance at the Regional Counseling Center of Oil City, Pennsylvania, in January of 2005. (R. at 484). At that time, she appeared on an emergency basis due to extreme distress stemming from her recent separation

from her husband. (R. at 484). She was tearful, complained of racing thoughts, guilt, anger, and sadness. (R. at 484). Yet, there are no records of any further treatment until April of 2006. (R. at 254 – 59). When examined by other doctors as part of routine diagnostic procedures for physical ailments, Plaintiff's mental condition was noted as mildly anxious, with appropriate mood, affect, and insight. (R. at 151, 210).

In April of 2006, an Adult Interview Summary was completed by Venango County Mental Health. (R. at 254 – 59). The summary included descriptions of violent childhood physical abuse, and alcohol abuse. (R. at 254 – 59). Plaintiff was noted to have an angry, sad, and depressed mood, poor attention, and poor sleep. (R. at 254 – 59). She was also noted as suffering from bipolar disorder, and was easily excitable. (R. at 254 – 59). She was tearful at the time of the interview because of personal issues with her daughter. (R. at 254 – 59). However, she was considered to be, "pretty good," and her speech was not agitated. (R. at 254 – 59). Plaintiff appeared well-groomed, made average eye contact, had average and logical thought processes, exhibited a full range of affect, and was cooperative. (R. at 254 – 59). She mentioned enjoying a good relationship with her boyfriend. (R. at 254 – 59). She denied wanting medication. (R. at 254 – 59).

She underwent a psychiatric evaluation at the Regional Counseling Center in June of 2006 following complaints of traumatic flashbacks and nightmares. (R. at 454 – 57). She sought admission to a partial hospitalization program. (R. at 454 – 57). Plaintiff was described as a very intense, angry, and emotionally labile individual. (R. at 454 – 57). She had a history of brutal childhood trauma, chronic anxiety, depression, alcohol abuse, and poor self-image. (R. at 454 – 57). Plaintiff's anxiety and panic attacks had been improving, however. (R. at 454 – 57). Bouts of rage were a problem in her youth, but Plaintiff denied any issues with rage since. (R. at

454 – 57). Yet, she did still exhibit anger as well as verbal and emotional aggression. (R. at 454 – 57).

Plaintiff was diagnosed with PTSD, dysthymic disorder, generalized anxiety disorder, panic disorder in partial remission, major depressive disorder in remission, alcohol abuse, and borderline personality disorder. (R. at 454 – 57). She was given a global assessment of functioning[6] ("GAF") score of 35 – 45. (R. at 454 – 57). According to the medical director of the facility, Charles Romero, M.D., it was medically necessary for Plaintiff to engage in a partial hospitalization program. (R. at 454 – 57).

Plaintiff continued treatment at the Regional Counseling Center through 2008 – the end of the record. Over the course of treatment, Plaintiff's mental status fluctuated, but would see improvement with medication management and therapy. (R. at 450, 466). She was commonly noted to suffer from anxiety, depression, and racing thoughts, was excitable and sometimes tearful, professed anger, was aggressive and outspoken, and often had difficulty settling down – particularly to go to sleep. (R. at 449 – 51, 453, 459 – 62, 467, 472, 474 – 78, 481, 483). However, she also was typically noted to be fully alert and oriented, with linear, coherent, organized thoughts, had a normal appearance and was nicely dressed, and was cooperative. (R. at 449, 451, 453, 459 – 62, 467, 472, 474 – 78, 481, 483). As late as 2007, Plaintiff was noted to

---

[6] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

play computer games, take care of her granddaughter, clean, play with her dogs, play in a dart league, sew, cook, sing, and dance. (R. at 480). She also would go to the bar at least once a week and drink ten to twelve beers at a time. (R. at 459 – 62). Her GAF scores also fluctuated; she received a score of 50 in September of 2006, 45 – 50 in April of 2007, and 45 in April of 2008. (R. at 459 – 62, 466, 473). Her diagnoses generally remained the same.

Plaintiff eventually left the partial hospitalization of her own accord, because she did not feel she was able to commit the time to the program that her counselors required. (R. at 482). At the time of discharge, however, she did show marked improvement in her psychological stability. (R. at 482). She continued with counseling sessions every few weeks, and also entered into group therapy. Group therapy notes indicated an improvement in Plaintiff's mental status over time. (R. at 451 – 52). Plaintiff stopped taking prescribed medication around February of 2007 due to a loss of insurance, but was noted to have restarted around July of 2007. (R. at 450, 480).

E. Medical Assessments

On May 16, 2006 a Pennsylvania Department of Public Welfare Employability Assessment Form was filled out by one of Plaintiff's physicians, and indicated that Plaintiff suffered from left leg pain and bipolar disorder, and that she was temporarily disabled from all forms of work beginning May 30, 2006, and ending September 1, 2006. (R. at 267 – 68). These conclusions were supported by a physical examination, review of medical evidence, clinical history, and appropriate tests and diagnostic procedures. (R. at 267 – 68). None of the actual sources were specifically listed, and no specific factual bases were provided.

On November 3, 2006, Robert P. Craig, Ph.D. conducted a Clinical Psychological Disability Evaluation of Plaintiff on behalf of the Pennsylvania Bureau of Disability Determination. (R. at 394 – 400). Plaintiff was brought to her evaluation by her son-in-law, but

was noted to be capable of driving.  (R. at 394 – 400).  She walked into the examination room with ease.  (R. at 394 – 400).  Her attention, concentration, motivation, and self-sufficiency were all within normal limits.  (R. at 394 – 400).

Dr. Craig noted Plaintiff's lengthy history of mental instability and abuse.  (R. at 394 – 400).  However, she presented herself reasonably well.  (R. at 394 – 400).  She was cooperative and appeared to be honest.  (R. at 394 – 400).  She was observed to be nervous, fidgety, restless, and unable to sit still.  (R. at 394 – 400).  Plaintiff complained of everyday depression and anxiety.  (R. at 394 – 400).  She also explained that she was frequently irritable.  (R. at 394 – 400).  Yet, she exhibited no deficiencies in thinking and reasoning, was alert and oriented,  had good memory, and had adequate decision making skills.  (R. at 394 – 400).  Her activities of daily living included occasional cooking, cleaning, and care for one of her grandchildren.  (R. at 394 – 400).  She did not socialize with many people, however.

Dr. Craig concluded the evaluation by stating that Plaintiff's concentration and focus were not sufficient to keep her on-task, and therefore, her persistence and pace were poor.  (R. at 394 – 400).  Plaintiff was not considered to be otherwise functionally limited – Dr. Craig opined that she was capable of working full time, but chose not to do so.  (R. at 394 – 400).  He diagnosed Plaintiff with mild major depressive disorder and PTSD, and assessed a GAF score of 52.  (R. at 394 – 400).

On December 4, 2006, Douglas Schiller, Ph.D. conducted a mental residual functional capacity ("RFC") assessment of Plaintiff.  (R. at 408 – 10).  In the assessment, Dr. Schiller concluded that Plaintiff was either moderately or not significantly limited in all areas of functioning.  (R. at 408 – 10).  He found that Plaintiff suffered medically determinable impairments in the way of affective anxiety, alcohol abuse, and personality disorders.  (R. at 408

– 10). Based upon the most recent medical records at the time, Plaintiff was capable of carrying out short, simple instructions, and had no limitations in basic understanding or memory. (R. at 408 – 10). Dr. Craig's earlier assessment was given great weight in Dr. Schiller's assessment. (R. at 408 – 10). Plaintiff was determined to be capable of maintaining gainful, full time employment. (R. at 408 – 10).

Also on December 4, 2006, state agency consultant Holly Benton completed a physical RFC assessment of Plaintiff. (R. at 424 – 29). Plaintiff was diagnosed with degenerative left knee changes. (R. at 424 – 29). As a result, she was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, could stand and walk for approximately six hours in an eight hour workday, could sit approximately six hours, and could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. at 424 – 29). Plaintiff was not otherwise physically limited. (R. at 424 – 29). Based upon the evidence of record, Plaintiff's subjective complaints of limitation were found to be only partially credible. (R. at 424 – 29). Ms. Benton found that Dr. Fritz noted no joint effusion or ligament laxity in Plaintiff's left knee. (R. at 424 – 29). Imaging did show degenerative changes, but Plaintiff had good range of motion. (R. at 424 – 29). Further, Plaintiff's accounts of daily activities such as caring for her personal needs, caring for her household, driving a car, and ability to ambulate without an assistive device suggested fewer limitations than were claimed by Plaintiff. (R. at 424 – 29).

F.   Administrative Hearing

At her hearing, Plaintiff testified that her last full time job was as a part time manager at, "European Express." (R. at 23). She left the job in April of 2005 because the business closed. (R. at 23). Plaintiff had not worked in any capacity since that time. (R. at 24). Plaintiff believed that she was prevented from working – physically – by her left knee pain, diverticulosis, GERD,

general arthritis, and headaches. (R. at 24). Plaintiff explained that Dr. Fritz performed surgery on her left knee around February of 2008. (R. at 27 - 28). Plaintiff's knee did not improve as a result of the procedure; however, prescribed medication for her pain did provide relief. (R. at 29). She believed that she could only stand for an hour before needing to sit for fifteen to thirty minutes. (R. at 44). On particularly bad days, Plaintiff explained that her left leg would swell and force her to remain on the couch and apply ice. (R. at 45). Bad days could occur two to three times per week. (R. at 45).

With respect to her diverticulosis, Plaintiff described frequent upset stomach, diarrhea, gas, and abdominal cramping. (R. at 31). She could experience these symptoms two to three times per week. (R. at 31). Plaintiff was not placed on a special diet, but did take prescription medication for treatment. (R. at 31). As to Plaintiff's GERD, Plaintiff complained that she suffered symptoms of acid reflux every day without proper medication. (R. at 32). With medication, her GERD was well controlled. (R. at 32). Plaintiff's physicians advised that she cease drinking to ease the symptoms of her diverticulosis and GERD, but she did not do so, and continued to drink beer regularly. (R. at 32). Plaintiff asserted that her symptoms only started after she had her gallbladder removed. (R. at 48).

Arthritis pain allegedly affected all of Plaintiff's joints. (R. at 32). Yet, she lived in a second floor apartment, and would ascend and descend the stairs approximately two to three times each day. (R. at 33). Headache pain was also a factor to which Plaintiff attributed her inability to work. (R. at 36). She claimed she suffered headaches every day, and that medication only provided minimal relief. (R. at 36). She believed she had suffered from these headaches her entire life. (R. at 36 – 37). Once or twice a week, Plaintiff would experience excruciating headaches that rendered her largely non-functioning, lasting six to seven hours at a time and

requiring her to lie down in a dark, quiet room.  (R. at 37).  The headaches had been worsening over the past three to five years.  (R. at 38).

Plaintiff claimed that – psychologically – she was prevented from working by depression, anxiety, panic attacks, irritability, and anger.  She claimed to have suffered from depression throughout most of her life.  (R. at 40).  It could become so bad that she would not wish to leave her home, see other people, get dressed, cook, or care for her personal hygiene.  (R. at 40).  She often also had difficulty sleeping.  (R. at 40).  Plaintiff's anxiety caused her to become nauseous, to shake, and to have diarrhea.  (R. at 41).  Plaintiff claimed her blood pressure also elevated significantly.  (R. at 41).  The anxiety also caused her to avoid social interaction, and could last for up to two weeks at a time.  (R. at 41).  She would go for several days at a time without seeing her boyfriend.  (R. at 42).  When her depression and anxiety were worst, Plaintiff would not even go to the bar.  (R. at 42).  When she worked, she would simply leave in the middle of a shift.  (R. at 43).  Plaintiff explained that she had problems interacting with people, in general.  (R. at 43).  She was frequently confrontational, and had on very rare occasions become physically violent when provoked.  (R. at 43).  Allegedly, Plaintiff once attacked her boyfriend due to an uncontrollable outburst of rage.  (R. at 44).  Plaintiff stated that she no longer provided any sort of care for any of her grandchildren.  (R. at 35).

Plaintiff explained that she had restarted therapy at the Regional Counseling Center in 2006 – after over a year had passed since her last visit – because she could not, "handle things." (R. at 29).  She acknowledged that she still drank alcohol once or twice a week to the point of intoxication.  (R. at 29 – 30).  She went to a local bar, often by herself, but sometimes accompanied by a friend.  (R. at 30).  However she averred that her drinking had decreased somewhat over the previous six months.  (R. at 30).

Plaintiff testified that she spent most days playing computer games and watching television. (R. at 33). In the winter, she was also a member of a dart team competing within a larger league. (R. at 33 - 34). She claimed that she no longer sewed, sang, or danced for fun. (R. at 35). She alleged that the last time she had taken part in such activities was in the early 1980's. (R. at 35). Plaintiff still lived with and cared for her dog. (R. at 50).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a significant number of jobs in the national economy would be available to a hypothetical person of Plaintiff's age, educational background, and work experience, but limited to light exertional work requiring no more than occasional climbing, balancing, stooping, crouching, crawling, kneeling, and postural movements, simple, routine, repetitive tasks not performed in a fast paced production environment, involving only simple work related decision making and relatively few workplace changes, low levels of stress and no independent decision making or close supervision by or interaction with supervisors, co-workers, and the general public, and including ready access to a restroom. (R. at 51).

The vocational expert responded that such a person could perform the job of, "ticketer," with 160,000 positions available in the national economy, the job of, "garment sorter," with 400,000 positions available, and the job of, "cleaner," with 1.4 million positions available. (R. at 52). The ALJ then asked whether any of the jobs would be affected if the hypothetical person could not use foot controls with the left lower extremity. (R. at 53). The vocational expert replied that such a condition would not affect the availability of the aforementioned jobs. (R. at 53).

The ALJ then changed the hypothetical and inquired as to what jobs would be available if the hypothetical person could only do sedentary work. (R. at 52). The vocational expert

explained that the hypothetical person could work as a, "document preparer," with 200,000 positions available, as an, "assembler," with 450,000 positions available, and as a, "ticket check," with one million positions available. (R. at 53 – 54). However, none of the listed jobs under any exertional level would be available if the hypothetical person was absent from work more than one half day per month, or was off task for more than fifteen percent of a given work day on a consistent basis. (R. at 54).

The ALJ concluded the hearing by holding the record open for a further two weeks in order for Plaintiff to receive and submit additional records from Dr. Fritz, the Seneca Medical Center, and a Dr. Pattalino. (R. at 55). Plaintiff did not indicate that there would be any other anticipated submissions for the record. (R. at 55). The ALJ asked that Plaintiff send a request to him, in writing, if any additional time was needed. (R. at 55).

## V. DISCUSSION

Following the administrative hearing, the ALJ issued a decision denying Plaintiff disability benefits. He determined that Plaintiff suffered severe medically determinable impairments in the way of mood disorder, anxiety disorder, PTSD, degenerative changes in the left knee, diverticulosis, and headaches. (R. at 13). Plaintiff was found capable of performing light exertional work, but was limited to jobs not involving more than occasional climbing, balancing, stooping, crouching, crawling, and kneeling, a fast paced production environment, independent decision making, high stress, or close supervision or interaction with co-workers or the general public, and allowing easy access to a restroom, involving only simple work related decisions, routine, repetitive tasks, and relatively few work place changes. (R. at 15). Consistent

with the testimony of the vocational expert, Plaintiff qualified for a significant number of jobs in the national economy.  (R. at 18).

In her Motion for Summary Judgment, Plaintiff objects to the ALJ's decision and seeks a remand of the case based upon the alleged failure to properly analyze Plaintiff's impairments under Step 3, because the ALJ did not support his findings at Step 5 with substantial evidence, and because new evidence merits reconsideration.  (ECF No. 11 at 18 – 25).  Specifically, Plaintiff first argues that the ALJ erred at Step 3 by failing to explicitly identify and analyze all of the potential disability listings for which Plaintiff may have qualified.  (ECF No. 11 at 19).

It is the established law of this circuit that as long as the ALJ's decision – when read as a whole – reveals that the ALJ considered the appropriate facts when deciding that a claimant did not meet any specific disability listings, the ALJ's determination is supported by substantial evidence.  *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  The ALJ must adequately develop the case record and discuss the findings supporting his conclusion that none of the listings at Step 3 are met.  *Id.* at 504 – 05 (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 – 20 (3d Cir. 2000)).  However, in so doing, the ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis." *Id.* at 505.  *See Scatorchia v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 468, 470 – 71 (3d Cir. 2005) (An ALJ satisfies *Jones* and *Burnett* "by clearly evaluating the available medical evidence in the record and then setting forth the evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."); *Scuderi v. Comm'r of Soc. Sec.*, 302 Fed. Appx. 88, 90 (3d Cir. 2008) ("[A]n ALJ need not specifically mention any of the listed impairments.").

Given that there is no required format for discussion of qualification under a listing at Step 3, this court is not persuaded that the ALJ's determination at Step 3 was improper.

Moreover, Plaintiff fails to specify – with any particularity – which listings should have been considered and what evidence supports the assertion that any listing could have been met. As argued by the Defendant in his brief, the ALJ thoroughly discussed Plaintiff's impairments, and there is no indication by Plaintiff, or otherwise, that any specific listings would have actually been met. As such, Plaintiff's argument at Step 3 fails.

Plaintiff next challenges the determination of the ALJ at Step five in several respects. She claims that the ALJ gave undue weight to Plaintiff's activities of daily living, failed to adequately consider the findings of Plaintiff's treating physicians, mischaracterized the medical evidence on record, and ignored Plaintiff's GAF scores. (ECF No. 11 at 19 – 24). As a result, Plaintiff claims that the ALJ's hypothetical to the vocational expert and the resultant RFC assessment were not supported by substantial evidence. (ECF No. 11 at 19 – 24).

When rendering a decision, an ALJ must generally provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). *See also Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000); *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ adequately met his responsibilities under the law.

Many of Plaintiff's purported impairments, including those regarding the degree of her

personal functioning, her difficulty interacting with people, her generalized leg pain and swelling, and her poor concentration and attention, were primarily subjective in nature. In such cases, a claimant's reports of daily activities are undoubtedly relevant evidence of the true severity of a claimant's subjective complaints, and may be used to partially or completely discredit such complaints. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999); *Burns v. Barnhart*, 312 F.3d 113, 130 (3d Cir. 2002).

Plaintiff complained of difficulty functioning independently; however, she reported substantial engagement in household chores on a daily and weekly basis, she was capable of shopping and driving on her own, she cared for her dog, cared for her personal hygiene without reminders, prepared meals, occasionally went fishing, and regularly went to the bar. (R. at 120 – 32). As pointed out by the ALJ, these are not activities that are indicative of significant daily functional limitation, and Plaintiff's subjective complaints were reasonably determined to lack complete credibility. (R. at 14).

Further, in terms of social functioning, while Plaintiff claimed significant difficulties – such as with co-workers – she managed to interact with her sister and daughter while cleaning her house on a regular basis, she participated on a team in a dart league, she went to the bar with her friend, she got along with people in authority most of the time, and would at times go out to sing. (R. at 120 – 32, 480). As stated by the ALJ, these are not activities indicative of significant social limitation, and while there is evidence that Plaintiff did suffer from irritability, anger, and difficulty getting along with others, Plaintiff's activities did not suggest the degree of limitation she averred. (R. at 14). Additionally, in the hypothetical and RFC assessment, the ALJ provided that Plaintiff would not be required to be under close supervision, and would not

need to interact with co-workers and the general public.  (R. at 15).  I find that these limitations were supported by substantial evidence.

While Plaintiff also complained of difficulty with concentration and attention to medical practitioners such as Dr. McLaughlin, Dr. Romero and the Venango County Mental Health interviewer, as explained by the ALJ, she was often found by medical sources – including Dr. McLaughlin – to consistently exhibit logical, linear thought processes, and clear, coherent, and unpressured speech.  (R. at 14, 254 – 59, 277 – 80, 433 – 36, 449, 451, 453 – 62, 467, 472, 474 – 78, 481, 483).  Dr. Craig mentioned that Plaintiff's attention and concentration were within normal limits, and she was not otherwise functionally limited.  (R. at 17, 394 – 400).  Moreover, in his hypothetical and RFC assessment, the ALJ included limitations such as, no fast paced production environments, no independent decision making, only simple work related decisions, only routine, repetitive tasks, and few work place changes.  (R. at 15).  I find that the above limitations in the hypothetical and RFC assessment were supported by substantial evidence.

Plaintiff frequently complained of pain and swelling in her left leg; however, none of her physicians attributed any limitations to these complaints. (R. at 17).  Further, physical therapy records illustrated marked improvement in strength, range of motion, and pain.  (R. at 272, 282 – 94, 302).  Physical therapy also allowed her to climb stairs without difficulty.  (R. at 272, 282 – 94, 302).  In the past, Plaintiff reported taking care of her granddaughter, cleaning, playing with her dogs, playing darts, singing, and dancing.  (R. at 17).  These accounts of Plaintiff's activities lead the ALJ to believe Plaintiff was not as limited as she claimed.  I find that substantial evidence supported the ALJ's conclusion as to the extent to which Plaintiff's knee condition was genuinely limiting.

In terms of his consideration of physician evidence, Plaintiff's argument that the ALJ did not properly consider the opinions of Dr. McLaughlin, a Dr. Fell, Dr. Craig, and Dr. Schiller, falls short. The Employability Assessment Form filled out by Dr. Fell which indicated that Plaintiff was disabled from working for a period of time, was reasonably given little consideration. (R. at 267 – 68). The form indicated that Plaintiff was temporarily disabled as a result of leg pain and bipolar disorder, but provided no narrative explanation as a basis for such a conclusion. (R. at 267 – 68). Such an evaluation is not entitled to significant weight. Moreover, in addition to its minimal probative value, the assessment indicated that Plaintiff was only disabled from working for a period spanning approximately three months. (R. at 267 – 68). That is insufficient to establish disability under the Act.

While the ALJ did not provide lengthy discussion of the medical notes of Dr. McLaughlin, he did analyze Dr. McLaughlin's finding that Plaintiff experienced dramatic improvement in her headaches with prescription medication. (R. at 16 – 17). Moreover, the numerous instances in which Plaintiff provided conflicting accounts of the severity, duration, and number of headaches suffered was sufficient for the ALJ to question her true degree of limitation. (R. at 16 – 17, 36 – 38, 305). Plaintiff provides no reason why her headaches were not fully accommodated by the ALJ's RFC assessment, particularly where he limits her to a low stress environment.

Additionally, with respect to Dr. Craig's and Dr. Schiller's evaluations, Plaintiff asserts that the ALJ erred in relying upon them because they were irreconcilable with one another. It should be noted that although Dr. Schiller gave Dr. Craig's assessment great weight when completing his own evaluation, he also indicated that Dr. Craig's assessment was only, "fairly consistent," with the records in Plaintiff's file. (R. at 410). Such a statement clearly indicates

that Dr. Schiller differed somewhat in his personal assessment of Plaintiff's functional capabilities, and this slight difference was reflected when he noted that Plaintiff had some moderate difficulties in certain areas of functioning where Dr. Craig had found none. However, he too concluded that Plaintiff was capable of full time work. Further, the ALJ never stated that the opinions of Dr. Craig and Dr. Schiller were completely consistent, only that he gave these opinions weight according to the opinions' consistency with the objective evidence on record. (R. at 17). Moreover, the ALJ accommodated the moderate limitations findings by Dr. Schiller in his hypothetical and RFC assessment, even though Dr. Craig found no such limitations.

Under the ALJ's Step 5 analysis, Plaintiff also calls into question the ALJ's treatment of medical evidence regarding Plaintiff's obesity, gastrointestinal issues, excitability and pressured speech, and diagnosed personality disorder. With respect to Plaintiff's diverticulosis and GERD, and as recognized by the ALJ, it has been established that despite the urging of her doctors, Plaintiff did not stop her use of alcohol as a way of improving her symptoms – as she admittedly drank several times a week to the point of intoxication. (R. at 17, 30 – 32, 120 – 32, 207 – 11, 306, 356). Further, the complained-of severe, chronic nausea and diarrhea had not resulted in weight loss. In fact, Plaintiff had gained weight. (R. at 120 – 32). While Plaintiff was diagnosed with diverticulosis, there were no indications of diverticulitis. (R. at 17, 317). As such, the ALJ was entitled to conclude that Plaintiff was not as limited by her gastrointestinal issues as she claimed. Plaintiff also fails to persuade this court that the ALJ's provision for ready access to a bathroom in his hypothetical and RFC assessment did not adequately accommodate Plaintiff's issues.

In terms of Plaintiff's claimed excitability, anger, irritability, and pressured speech, the ALJ noted that Dr. Craig found Plaintiff had no limitation in her ability to respond to

supervision, co-workers, or work pressures. (R. at 17). Plaintiff was capable of attending a friend's party, frequented a local bar with her friend, interacted with a friend and her daughter on a regular basis to clean her house, had a boyfriend, typically exhibited normal thought processes, and also was observed to have clear, coherent speech that was neither rapid nor pressured. (R. at 14, 17). As to Plaintiff's obesity and personality disorder, while both were clearly mentioned in the medical record, Plaintiff fails to provide functional limitations which were attributed to these conditions, but not accommodated by the ALJ in his hypothetical and RFC assessment. Alone, these diagnoses do not preclude employment or establish functional limitations. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Therefore, remand is not justified.

Plaintiff's final argument under Step 5 involves the ALJ's failure to explicitly discuss the differing GAF scores assessed by various sources over the course of the record. The Court of Appeals for the Third Circuit has held that a "GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings." *Gilroy v. Astrue,* 351 Fed. Appx. 714, 715 – 16 (3d Cir. 2009) (citing 66 Fed. Reg. 50764-5 (2000)). Lower courts in this circuit have further recognized that while GAF scores can indicate an individual's capacity to work, they also correspond to unrelated factors, and absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score does not establish disability. *Coy v. Astrue*, 2009 WL 2043491 at *14 (W.D.Pa. 2009) (citing *Chanbunmy v. Astrue*, 560 F.Supp.2d 371, 383 (E.D.Pa. 2008)). Further, where a treating source has failed to provide specific limitations findings to explain a given GAF score, or to tie the GAF score into some explanation of a claimant's ability to work, a court cannot be expected to provide a specific assessment of the GAF score. *Gilroy*, 351 Fed. Appx. at 716. *Cf. Pulos v. Astrue*, 2010 WL 2367504 *12 n 8 (W.D. Pa. June 9, 2010) (where the ALJ was directed to consider a GAF score on remand,

because – unlike the *Gilroy* case – the party assessing the GAF score made statements regarding specific limitations that explained the basis for the score).

The case record shows that Plaintiff received five GAF scores over three years of treatment and evaluation. In 2006, she received scores of 35 – 45, 50, and 52; in 2007, she received a score of 45 – 50; and, in 2008, she received a score of 45. (R. at 394 – 400, 454 – 57, 459 – 62, 466, 473). Plaintiff is correct that the ALJ did not mention any of these scores explicitly in his determination. Yet, this is not a case where the ALJ merely cherry picked certain GAF scores to bolster his conclusions, and similarly to the case in *Gilroy*, no specific limitations findings accompanied Plaintiff's GAF scores. *See Gilroy*, 351 Fed. Appx. at 716. As such, and in light of the discussion of Plaintiff's other objections at Step 5, the court finds that the ALJ's determination was adequately supported by substantial evidence.

Lastly, Plaintiff seeks remand of the case because newly submitted information – not considered by the ALJ – allegedly merits reconsideration of the case. (ECF No. 11 at 24 – 25). With respect to new evidence, a claimant may submit said evidence to the Appeals Council for consideration so long as it is material to the period of alleged disability on or before the date of the ALJ's hearing. *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001); 20 C.F.R. § 404.970(b). If the new evidence meets the requirements for review, the Appeals Council must evaluate the new evidence with the prior evidence on record as a whole to determine if the ALJ's decision was supported by substantial evidence. *Id*. However, the Appeals Council may decline review if the ALJ's decision is not at odds with the weight of the evidence on record. *Id*.

Where the Appeals Council denies review, the ALJ's determination is conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. In such a case, a district court can only review that evidence upon which the ALJ based his or her decision. *Matthews*, 239 F.3d at 594-95. As

a result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not within the purview of a district court when judging whether substantial evidence supports an ALJ's determination. *Id.*

A district court is not bound by regulation when reviewing an ALJ's decision, but is instead bound by the Act. 42 U.S.C. § 405(g) states that a "court shall have power to enter, upon *the pleadings and transcript of record*, a judgment affirming, modifying, or reversing a decision of the Commissioner." *Matthews*, 239 F.3d at 594 (citing *Jones v. Sullivan*, 954 F.2d 125, 128 (3d. Cir. 1991) ("Because . . . evidence was not before the ALJ, it cannot be used to argue that the ALJ's decision was not supported by 'substantial evidence.'")). A district court will not, therefore, directly consider new evidence, but instead remand for consideration "by the forum which is entrusted by the statutory scheme for determining disability *vel non*." *Matthews*, 239 F.3d at 594.

In order to remand, however, a claimant must make an appropriate request. *Matthews*, 239 F.3d at 592. The claimant needs to satisfy three requirements. *Id*. at 594. First, new evidence must be "new," in the sense that it is not cumulative of pre-existing evidence on the record. *Szuback v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984). Second, new evidence must also be "material," in that it is relevant to the time period and physical impairment(s) under consideration, it is probative, and it is reasonably possible that such evidence would have changed the ALJ's decision if presented earlier. *Id*. Third, "good cause" must be shown for not submitting the evidence at an earlier time. *Id*. The court demands these three showings be made to avoid inviting claimants to withhold evidence in order to obtain another "bite of the apple" when the Commissioner denies benefits. *Matthews*, 239 F.3d at 595

(citing *Szubak*, 745 F.2d at 834).  The court wishes to promote the presentation of all material evidence before the ALJ, as soon as possible.  *Id*. at 594-95.

Plaintiff's argument for remand fails, because, as is pointed out by Defendant, the evidence presented is cumulative and it is not reasonably likely to have changed the outcome of the case.  (ECF No. 13 at 27 – 30).  Amongst the new evidence are medical notes of Dr. McLaughlin, in which he reports that prescription medications Axert and Depakote controlled Plaintiff's headaches – by her own admission.  (R. at 532, 534, 536).  In June of 2009, Plaintiff complained of a sudden increase in headaches after a substantial period of relief, and Dr. McLaughlin attributed it to a change to a generic form of Depakote.  (R. at 604 – 05).  Plaintiff indicated that she was not interested in changing the medication back, however.  (R. at 604 – 05).  Dr. McLaughlin suggested switching back from the generic version of Depakote if symptoms continued to worsen.  (R. at 604 – 05).  An MRI of Plaintiff's brain in April of 2009 yielded largely unremarkable results.  (R. at 604 – 05).

With respect to Plaintiff's GERD, diverticulosis, and related symptoms, a colonoscopy and esophagogastroduodenoscopy yielded normal results.  (R. at 562 – 564).  Plaintiff was found to suffer from mild diverticulosis.  (R. at 562 – 64).  With respect to Plaintiff's left leg pain and swelling, it was determined that the pain and swelling were limited to Plaintiff's ankle.  (R. at 612 – 15).  The swelling only worsened by the end of the day, and had only worsened in the weeks prior to a July 2009 examination.  (R. at 612 – 15).  Plaintiff was noted as walking normally.  (R. at 612 – 15).

Finally, in terms of her mental state, notes from the Seneca Medical Center in May of 2008 indicated that Plaintiff was healthy and comfortable looking, and in no acute distress.  (R. at 576).  She walked normally, she was cooperative, she was in good spirits, she was boisterous,

and she made good eye contact.  (R. at 576).  While at the Regional Counseling Center in July of 2009, Plaintiff reported that she was generally doing fine, and that she felt good on her prescription medications and while engaging in therapy.  (R. at 609).

Following a psychological examination and evaluation by Martin Meyer, Ph.D., and Julie Uran, Ph.D, in October of 2008, Plaintiff's dress and hygiene were noted to be good, she made good eye contact, she was cooperative, her speech was coherent and spontaneous, her thoughts were normal and relevant, she exhibited average intelligence, adequate vocabulary, and basic math skills, she was alert and oriented, with the exception of certain childhood events, Plaintiff's memory was intact, and her social judgment was appropriate for her age.  (R. at 580 – 86).  She did cry at points, showed some anger, had limited insight, and needed to stand for a while because of her leg pain.  (R. at 580 – 86).  She exhibited symptoms indicative of attention deficit hyperactivity disorder, in that she had trouble with attention, concentration, organization, and task completion.  (R. at 580 – 86).  She was determined to have difficulties in vocational settings with attention and concentration, pace, overwhelming anxiety and depression, and interaction with others.  (R. at 580 – 86).  Plaintiff was diagnosed with bipolar disorder, alcohol disorder, generalized anxiety disorder, PTSD, and personality disorder.  (R. at 580 – 86).  She was given a GAF score of 50.  (R. at 580 – 86).

None of this evidence differs significantly from what was presented earlier to the ALJ. As Defendant argues, there were no additional limitations enumerated which were not accommodated already in the ALJ's RFC assessment, and certain evidence only serves to bolster the ALJ's conclusions.  (ECF No. 13 at 27 – 30).  As such, Plaintiff has not provided sufficient justification to remand the case for reconsideration in light of the new evidence that was provided.

## VI. CONCLUSION

Based upon the foregoing, the ALJ properly supported his conclusions with substantial evidence, and Plaintiff failed to make a sufficient showing under *Szubak* to justify a remand for consideration of new evidence. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the opinion of the ALJ is affirmed. An appropriate Order follows.

s/ Sean J. McLaughlin
United States District Judge

cm/ecf: All parties of record.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SANDRA L. CURRAN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-142 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant | ) | |

## <u>ORDER</u>

AND NOW, this 23rd day of June, 2011, for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [ECF No. 10] is DENIED, and that Defendant's Motion for Summary Judgment [ECF No. 12] is GRANTED.

IT IS FURTHER ORDERED that the decision of the ALJ is AFFIRMED, and JUDGMENT is hereby entered in favor of Defendant Commissioner of Social Security and against Plaintiff Sandra L. Curran.

 The clerk is hereby directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.